MORSE DRY DOCK & REPAIR CO. v. MUNSON S. S. LINE.

(District Court, S. D. New York. June 6, 1907.)

ACCOUNT STATED—WHAT CONSTITUTES.

Where the repairer renders accounts for the work done and materials furnished and the owner of the vessels accepts the accounts and uses them to obtain its pay from the Government, to which they were chartered, upon assurances of correctness, and an examination of the accounts by the agents of the Government follows, the accounts will be deemed stated between the parties and a recovery for the full amount allowed without reduction for a commission claimed by the respondent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Account Stated, §§ 30–40.]

(Syllabus by the Court.)

In Admiralty.

Armstrong, Brown & Boland, for libellant.

Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge. This action was brought by the Morse Dry Dock and Repair Company against the Munson Steamship Line to recover a balance of $40,978.40 claimed to be due for repairs made on the steamships Bergen, Jacob Bright, Cubana and Laupar, between the 30th day of September and the 11th day of October, 1906. The libel alleges that bills to the extent of $75,978.40 were incurred on the vessels, of which the sum of $25,000 was paid on the 3rd of November and $10,000 on the 12th of November, leaving the balance due and owing since the 17th of October. The libel further alleges that previous to the furnishing of the work and materials for the vessels, the respondent had chartered them to the United States for various periods and at various rates and as follows:

"That it was agreed between the United States and the respondent that the smaller charter rates on said vessel were to be the normal rates, and that the additional amounts paid for the first fifteen days on each charter were to provide a fund for fitting up said vessels according to specifications, to render them available as transports for United States Army use.

Fifth: That the respondent engaged the libellant to fit up said vessels as aforesaid, and directed the libellant to spare no expense in the procuring of extra and night labor, and materials, to make the said vessels ready in the limited time required by the United States.

Sixth: That libellant employed extra and night labor as directed, and purchased materials on short notice, and performed the work of fitting up said vessels, within the time required by the respondent and the United States, and the reasonable value of such material and services furnished to each vessel was as follows:

| | |
|---|---|
| To the 'Cubana' | $21,522 56 |
| To the 'Bergen' | 15,362 29 |
| To the 'Laupar' | 13,961 18 |
| To the 'Jacob Bright' | 25,132 37 |

Seventh: That itemized bills for such work and materials against each vessel as aforesaid were delivered by the libellant as to the respondent between the 17th day of October, 1906, and the 20th day of October, 1906.

Eighth: That repeatedly between the 17th day of October, 1906, and the 26th day of December, 1906, the respondent admitted the said bills to be correct, and promised to pay on account of same, and to pay the bills in full as soon as the respondent received from the United States the amounts due to the respondent.

Ninth: That said bills so delivered to the respondent by the libellant, were by respondent presented to the United States, and were asserted, and certified by the respondent to be correct, and payment thereof demanded upon the ground that the extra charter monies aforesaid, agreed upon to be paid for fitting up said vessels, were insufficient to pay for same, because of the extra work not called for in the specifications, and extraordinary expenses incurred in complying with the demands of the United States in getting the said repairs completed within the time designated by the said United States, and that respondent was required to pay the said bills to the libellant; and that thereupon, pursuant to said demand, and on or about the 26th day of December, 1906 the United States paid to the respondent for the work and materials furnished by the libellant, the following amounts for each vessel:

'Cubana,' $9,042.25, besides the sum of $12,375, extra charter money previously paid.

'Bergen,' $4,428.25, besides the sum of $9,750, extra charter money previously paid.

'Laupar,' $5,817.38, besides the sum of $8.250, extra charter money previously paid.

'Jacob Bright,' $11,362.62, besides the sum of $13,500, extra charter money previously paid.

Tenth: That the respondent collected from the United States as aforesaid, the full amount of libellant's said bills, except for certain items aggregating about $1,452.90, which were for repairs or improvements to the ships not properly chargeable to the United States, but the respondent has refused to pay the libellant the aforesaid balance due to the libellant."

The answer denies that the total value of the repairs amounted to $75,978.40 or that the sum of $40,978.40 is due and makes some general denials, alleging that the libellant's charges were excessive and exorbitant and the respondent never stated that the bills would be paid and as follows:

"Tenth: Further answering the libel herein, and as a separate and distinct defense thereto, the respondent alleges that at the time the charter parties referred to, were entered into between the United States Government and the respondent, the Government's representative stated to the respondent that it would be necessary to make extensive repairs and alterations to said vessels to fit them for the Government's purposes. He requested respondent to undertake the supervision of said repairs, to see that said repairs were properly carried out, and that the work was pushed with all possible speed. It was also agreed between the Government's representative and the respondent that the respondent should be paid a reasonable compensation for its services in the matter of such supervision. Upon the completion of the work, the bills as above specified, were rendered by the libellant to the respondent, and were at once objected to by the respondent, who stated to the libellant that said bills were excessive and exorbitant. The libellant thereupon informed the respondent that if the Government would provide the respondent with funds sufficient to pay said bills the libellant would then take up the matter of the adjustment of said bills with the respondent, and make such reduction as would be reasonable and fair under all the circumstances. Said bills were then exhibited to the Government's representative who stated to the respondent that said bills were excessive and exorbitant. It was understood between the respondent and the Government's representative that the amount of said bills should be paid by the Government to the respondent, and that the respondent should then obtain from the libellant a reduction of said bills to a figure which should seem fair and reasonable, and that such reduced amount should be paid to libellant. Immediately thereafter the respondent requested the libellant to make a reasonable reduction from the amount of said bills, but the libellant has refused to make any reduction whatever, and has demanded the payment of said bills in full. The respondent has at all times been ready and is now ready and willing to pay the libellant an amount which shall be fair and reasonable compensation for the labor, material and services furnished by the libellant to the respondent, and is content to leave to this Honorable Court the determination of said amount.

Wherefore the respondent prays that this Honorable Court will be pleased to inquire into the matters herein set forth, and will fix and determine the fair and reasonable amount due from the respondent to the libellant by reason of the matters aforesaid."

The testimony on the part of the libellant shows that four bills covering the repairs to the steamers were duly rendered to the respondent and that the bookkeeper went to its office for the purpose of making some alteration in form, as requested by the respondent, and he then saw the Secretary of the corporation, Mr. Bromell, who said that the bill seemed to be all right but there was one in which he wished that the regular time and overtime of the workmen should be put in separate bills. The change was made and there was no further objection to the bills. Another witness was Mr. Morse, the general manager of the libellant, who said he called to see Mr. Bromell, who told him that he had not had time to go through the accounts thoroughly

but would pay $25,000 on account and take up the matter for final settlement when the Government had paid; that Mr. Bromell then asked what there was in the bills for them and they ought to have ten per cent. Mr. Morse replied that he was crazy, that they only made twelve per cent. and could not run their plant on two per cent. Mr. Bromell then said we can not give you more than $25,000 but would take up the matter with the libellant again and in the meantime Mr. Morse had better speak to his company about it which he promised to do; that Mr. Bromell did not make any statement that the bills were wrong; that on the 7th of November Mr. Morse called upon Mr. Bromell again and told him that he had put the matter up to his company and they had decided that if the Munson Company would pay the bills in full at once, they would be allowed five per cent., but Mr. Bromell refused to discuss that proposition saying:

"We are in your hands. We can't do that, we have not received the money from the Government but the commission will be optional with you when it is finally settled."

Mr. Morse then asked for another payment on account the reply to which was

"We can't give you any money today, but on Friday we will give you $20,000 more."

On that day a representative of the libellant was sent to the respondent but he was told that it could not pay the $20,000, and subsequently Mr. Morse had a conversation with Mr. Bromell in which he charged the latter with not keeping his agreement to which Mr. Bromell replied:

"I am not the whole show. Mr. Munson dont want to pay any more money until we get some from the Government, but probably next week we can give you some more."

And the next week the respondent did pay $10,000. About the 26th of December Mr. Bromell telephoned that he wished to make a settlement and Mr. Morse called upon him when the former said it wanted ten per cent off the bills, to which Mr. Morse replied:

"You know what I told you before, that we would give you five per cent if you advanced the money and we didnt carry it. Our company will give you about two per cent, which is $1,600, and that is all they will give. I have discussed the matter with them."

He refused and said if it did not give the respondent the commission, it would not pay the bills. He further testified that at none of their interviews was any objection made to the size of the bills; it was simply what it could get off for itself; that there was never any question as to the correctness of the bills. The witness then produced a copy of a letter from Mr. Bromell, with a proposed form of letter from the libellant to the respondent as follows:

"New York, December 8, 1906.

Morse Dry Dock & Repair Company
    Mr. E. P. Morse, General Manager
        Foot 56th St., Brooklyn, N Y
Dear Sir:
    The Quartermaster's Department at Washington has returned to the Quartermaster in New York, accounts for extraordinary charges in the fitting up of the 'Cubana,' 'Bergen,' 'Laupar' and 'Jacob Bright' asking for an explana-

tion as to why these abnormal charges were incurred, and we wish to have a letter from you, addressed to ourselves, embodying the phraseology of the pro forma letter which we enclose. Kindly write this at your earliest convenience, and send it to us, and oblige. Monday if possible.

Yours very truly,

Munson Steamship Line
A. H. Bromell
Secretary."

"New York, December 8, 1906.

Munson Steamship Line
82 Beaver Street, New York

Dear Sirs:

In connection with the expenses of fitting up your steamers 'Cubana,' 'Bergen,' 'Laupar' and 'Jacob Bright' for the carriage of animals for the Quartermaster's Department, we desire to say that the conditions prevailing at the time this work was done were such that the fitting up of the ships could only be done with the greatest difficulty, owing to the fact that some 17 to 18 boats were being equipped at the same time, and the services of competent carpenters was almost impossible to obtain. We were compelled to utilize any character of carpenters which we could obtain, and work them day and night, naturally getting but very poor results and entailing a vastly increased outlay of money for a minimum amount of return. You no doubt are aware of the fact that we are compelled to pay carpenters three and one quarter days for each night worked and on this basis for each part thereof. The men, naturally, being worked continuously, could perform very inadequate service. We regret that these conditions should have prevailed, but we assure you that the very utmost was done under these very disadvantageous conditions.

Yours very truly,"

The words "You no doubt are aware of the fact that we are compelled to pay carpenters three and one quarter days for each night worked and on that basis for each part thereof" were added to the draft suggested to Mr. Bromell by Mr. Morse.

A letter dated December 28, 1906, from the libellant to the respondent was also produced.

"Dec. 28, 1906.

The Munson Steamship Line,
82 Beaver Street,
New York City.

Gentlemen:

Referring to Mr. Bromell's conversation, yesterday, with our Mr. Morse, we cannot afford to allow you more than two per cent discount on the bills S. S. 'Cubana', 'Laupar', 'Bergen' and 'Jacob Bright.' Considering the extraordinarily long delay in payment of these bills by you and the necessity we were thereby placed under of borrowing funds, and payment of interest thereon, properly we should not now be asked to allow any discount whatever, but, in order to preserve our excellent friendly relations also to get the full balance of money now due us from you promptly, we will allow you two per cent on the face of the bill, providing, however, we have check for balance in full not later than noon Dec. 31st, 1906. Should we not receive a check by that time, we shall be obliged to refuse any discount whatever on said bill. In order that there shall be no misunderstanding about the amount of our account, the four vessels' bills make a total of $75,978.40; decreasing it by 2 per cent, viz., $1,519.57, and by the $35,000 previously paid on account, leaves a net balance due us of $39,458.83.

We sincerely trust that this disposition of the matter will be entirely satisfactory to you, upon reflection as to our limited profits, as explained by Mr. Morse to you, as well as our loss of use of these funds for so long

Yours very truly, Morse Dry Dock & Repair Co.
D. J. Leary
Pres."

The witness further testified that no reply was received to this last letter and the discussion throughout was on the basis of a commission, the amount of which was left with his company.

The libellant next produced as a witness a Mr. Nye, who said that he was Marine Superintendent of the United States Transport Service and had general supervision of fixing up vessels. As the witness was proceeding to testify, objection was made on behalf of the respondent that he could not be a witness to the correctness of the bills which was the subject of the controversy. The witness was allowed to testify, however, and the question was reserved as to the admissibility of his testimony. Even as an admission, it would have been competent. The fact that the admission was made to a third party seems immaterial. It is said in 1 Amer. & Eng. Enc. of Law, 675: "Admissions may be made to the adverse party, or his agent, or to a third person." It was not necessary for the libellant to prove an express consent by the respondent to the correctness of the account, such consent could be implied from the surrounding circumstances. Spellman v. Muehlfeld, 166 N. Y. 245, 59 N. E. 317. The admission of the testimony seems to have been correct.

Mr. Nye testified that he had general supervision of the vessels on the part of the Government and all bills were handed to him to examine; that the bills were the subject of discussion between Colonel Miller, of the Quartermaster's Department, Mr. Frank Munson, of the respondent company and himself; that he had previously gone over them with Mr. Munson who said that the bills were excessive. and gave the reasons therefor; that the bills were returned to Mr. Munson, after the witness had checked them off and found there were certain charges there which rightfully belonged to the owner and not to the Government; that he had several subsequent interviews with Mr. Munson in order that the bills should be rendered in such a way as to show why the extraordinary charges were made; that the amount of the bills was finally settled at something over $75,000 and paid by the Government; that Mr. Munson did not continue to say that the bills were excessive; that he came to the conclusion that the bills were correct when he rendered them and they had all been straightened out; that he would not be positive that Mr. Munson signed the bills finally as correct but he thought he did so, as all bills have to be signed by the ship owner. The witness subsequently corrected his testimony with reference to Mr. Munson stating that the bills were excessive and said it was Colonel Miller and not Mr. Munson who considered the bills excessive; that Mr. Munson said he understood the bills to be correct, and the charges high because of night work and the labor strike; that Mr. Munson stated the reasons for the excess were "owing to night work, strikes which were on at that time, labor strikes, and working men three or four days; that is, I mean by that working day and night, and the men being pretty well fagged out, which they were"; that Mr. Munson gave these reasons why the bills were larger than was originally contemplated and put in the charter party.

Colonel Miller, whose official title was Lieutenant Colonel and Deputy Quartermaster General in the United States Army, Depot Quartermaster in New York, testified that when Mr. Munson first

brought the bills to him, he, Colonel Miller, in the presence of Captain Nye, looked them over and expressed the opinion that they were excessive; that Captain Nye and Mr. Munson were present at the time. The witness further testified:

"Q. What did Mr. Munson say as to that? A. Mr. Munson went into an explanation of the amount of the bills and the character of the bills, and gave as the reasons the condition of affairs in the ship yards in the Port of New York, consequent on the great number of chartered transports that were being fitted up, the labor troubles, strikes and night work, and because they worked twenty and forty hours without stopping; all tending to show that the bills would naturally run very high.

Q. Did he say anything as to whether they were right or wrong? A. It was to the effect that they were correct under the circumstances.

Q. After that, what did you do with the bills? A. I examined them over carefully in connection with Captain Nye. There were some items that were irregularly placed, different from that stated in the bills—charged against one ship that should be to another, my recollection is; certain expenses that were included in the charter party had been charged as extras, certain extras had been charged as extraordinary, and vice versa.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Q. Did you ever have any conversation with any of the officers of the Munson Steamship Line in regard to the payment by you on behalf of the Government of a commission for supervising this work? If so, state that to the Court. A. The Munson Company, through Mr. Frank Munson, rendered a bill of something over $6,000, for ten per cent of the Morse bills, for the supervision of the work.

Q. Did they ask you to pay it? A. Yes sir.

Q. What did you do about that? A. I refused to pay it.

Q. They wanted ten per cent. from the Government for their supervision? A. About that.

Q. It is stated in the answer to this libel, that at the time of the chartering of these four ships, the Government, through you, asked the Munson Steamship Company to undertake the supervision of these repairs, to see that they were properly carried out. Is that correct? A. Yes.

By Mr. Cortis. Q. Was that after the charter? A. At the time of the charter.

By Mr. Brown. Q. It is alleged that there was an agreement made between you and the Munson Steamship Company, that they should be paid for that supervision? A. Included in the extra charter money for the first fifteen days; the estimate by the Munson Company of the amount necessary to put the ships in shape.

Q. It is also asserted that there was an understanding or agreement between the Munson Steamship Company and you as the representative of the Government, that the amount of these bills as rendered by the Morse Company should be paid by the Government, and that then the Munson Company should obtain from the Morse Company a reduction of these bills to a figure which should be fair and reasonable, and that the Morse Company should only receive the reduced amount. Was there any such agreement made with you? A. None whatever."

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Cross-examined by counsel for respondent.

By Mr. Cortis. Q. Do I understand you to say that in the conversation you had with Mr. Munson it was understood between Mr. Munson and you that the compensation of the Munsons for their services in overlooking these repairs to the ships should be included in their figures, when they estimated the expense of these repairs? A. That is right. That is at the time the charter party was made.

Q. And that they should get their compensation by increasing the estimate—

Mr. Brown. We object, upon the ground that any contract between the Government and the Munson Steamship Company as to compensation to them for services we are not parties to.

The Court. I allow the question.

Ans. If I may take time enough to say what I mean: at the time the charter party was made, Mr. Munson at my request undertook to fit up certain ships, and in order to make the payment for the fitting up of the ships the ordinary charter party—the amount of it—was increased by so much over as to include the cost of the fitting up, in the first fifteen days of the charter party, and in fact the ten per cent, or whatever profit was coming to the Munson Company for fitting up the ships as estimated, was included.

Re-direct examination by counsel for libellant.

By Mr. Brown. Q. It turned out afterwards that the cost of fitting up was very much greater? A. Very much greater.

Q. And the difference was paid to them by these bills? A. Exactly.

Q. Was this compensation for the supervision of the work that they were to get— A. Under the charter party as estimated.

Q. Did they supervise this work? A. Not altogether, no sir.

Was the subject of this compensation brought up to you after the repairs were done, and they made the claim for supervision? A. At the time these bills were first presented.

Q. Then they made the claim for supervision? A. Yes.

Q. What did you tell them about it? A. That the estimate included the ten per cent—or whatever it was understood to be—of the amount, and that the supervision of the Morse ships was not coming to them in the extraordinary expenses.

Q. What did you mean? That they were not entitled to supervision of the Morse ships? A. Yes.

Q. Why? did you tell them? A. I think so, as I stated before.

Q. Why was it? A. On account of the estimate including that.

Recross by counsel for respondent.

By Mr. Cortis. Q. Is it your idea, was it your intention that they should pay themselves out of that money which they had charged? A. Out of that money?

Q. Out of the money which was paid over to meet the estimate they had originally made, that that estimate was supposed to be sufficiently greater than that of the Morse Company to pay them? A. Say that again, please.

Q. Was it your idea after this conversation, that they should make their estimate for the cost of the repairs sufficiently in excess of what the Morse Company would charge, to pay them for their services? A. No, that is not the way I put it. Munson and Company made the estimate to put the ships in shape, and as with all estimates it included the cost of the man that does the work.

Q. Of the Munsons? A. Yes.

Q. In other words, the cost of the Munsons would make for their services— A. Was included. That estimate was included in the increased charter money.

Q. And it was in that way they were to be paid for their services? A. Yes sir.

By Mr. Brown. Q. That was an understanding between you and the Munson Steamship Company? Mr. Morse was not there, was he? A. I did not know him at all."

Mr. Bromell was then called and testified that he had charge of fitting up the vessels; that he first knew that the charge therefor approximated $75,000 when he received the bills from the libellant; that Mr. Morse called upon him at his request and he told Mr. Morse that the bills were exorbitant and that Mr. Morse had better take them back and put them down to a proper basis before they were submitted to the Quartermaster's Department; that Mr. Morse took the matter under consideration and a day or two afterwards telephoned he could make no changes; that the witness then said all that could be done was to submit the bills as they were if no changes could be made; that he never said to Mr. Morse or to any one of his concern that he thought the bills reasonable; that all he said to Mr. Morse's book

keeper was that the bills required some alteration in form, but nothing about the reasonableness of the bills. On cross examination he said that the alterations were made on Captain Nye's instructions; that he paid something on account but all the time maintained the bills were excessive down to the time the money was received from the Government; that he did not collect the money, the settlement with the government having been made with Mr. Frank Munson; that what he picked out to be wrong was the number of men employed on a certain vessel at a certain time and the price he charged for materials, which he figured were 50 or 60 per cent higher than they should be; that when Colonel Miller thought the bills were excessive, he wanted to set before the Government certain statements that they were right; that he drafted the letter of December 8th and thought the facts there stated to be true to a very large extent; that he did not know how to explain wherein they were not true; that there may be degrees of truth; that the conditions expressed in the letter to be written by Mr. Morse, under request of December 8th, were true all through; (By Mr. Cortis) that it was merely an explanation of the conditions under which the work was done and to give some satisfactory reason for the bills being as they were; (By Mr. Brown) that to a certain extent he believed that what he said was true, the conditions as expressed in the letter there; that the bills which were on the bill heads of the Morse Company were copied on their own bills to the Government, that the Government demanded vouchers for everything and the Morse bills were sent with their own.

Frank C. Munson was then called upon to testify for the respondent and he said that he handled the matter entirely with Colonel Miller; that a couple of days after the bills came in Mr. Bromell advised him what the total amount was; that he never had any conversation, as he remembered, with the Morse Company; that he never stated to any one that he thought the bills reasonable.

On cross examination he testified as follows:

"By Mr. Brown. Q. You didn't think they were reasonable did you? A. I didn't think they were reasonable, no sir.

Q. And you never tried to explain to anybody that they were reasonable, did you? A. I talked with Colonel Miller about the bills, and told him what the circumstances were surrounding the work and so forth, which I had received from Mr. Bromell and the superintendent.

Q. What you told Colonel Miller was the truth, wasn't it? A. Yes sir.

Q. And it was because it was suggested by Colonel Miller that the bills were excessive, that you made this explanation, wasn't it? A. Yes.

Q. Col. Miller said they were excessive? A. I agreed with Col. Miller that the bills were excessive, and I told him that we had protested to Mr. Morse that the bills were excessive, but that Mr. Morse said that he couldn't reduce them.

Q. What were you trying to convince Col. Miller of? A. I was trying to convince Col. Miller that the bills could not be materially reduced, because Mr. Morse had taken the stand that they must be paid on or about the basis on which they were rendered.

Q. Then you deny that you told Col. Miller the bills were right, do you? A. I told Col. Miller—

Q. Just answer that question. Col. Miller has testified that you told him tht the bills were correct. Is that true? A. I told Col. Miller the bills as rendered would have to be paid.

Q. Col. Miller said they were excessive?  A. Yes sir.

Q. What were you trying to prove to Col. Miller?  A. We made a certain contract with the Government which was on a lesser basis than total bills rendered by Morse were.  I went to Col. Miller and said, 'Here are bills which are more than what we agreed to do the work for, and we will be out a certain amount of money if these bills are not paid.'  And he said, 'I dont want to see you people lose money on the contract, because I asked you to use your expert supervision in fitting up these boats.'

Q. What were you trying to convince him about the bills, that they were right or wrong?  A. I was trying to convince him they were right."

In rebuttal Mr. Morse testified as follows:

"By Mr. Brown.  Q. At any time from the time this negotiation began down to date, have you ever heard of any agreement in regard to the payment of compensation to the Munson Steamship Line for supervising the work you did?  A. Not until lately.  At that time I had not, no.

Q. When did you hear of any such agreement?  A. I think about a month ago.  Capt. Nye mentioned it.

Q. That was after this thing was all over?  A. After this thing was all over, yes.

Q. Up to that time you never heard about their being paid for supervision?  A. No.

Q. Was any suggestion ever made to you as to that effect?  A. No.

Q. Mr. Bromell testified to a conversation with you just after the bills were paid, in which he said he told you the bills were excessive and ought to be recast, taken back and refigured.  Do you remember that testimony?  A. Yes.

Q. Is that true?  A. (No answer)

By Mr. Cortis.  Q. Do you state that you remember the testimony?  A. Yes.

Q. Did anything like that happen?  Didn't he ask you to reduce the bills?  A. No sir.

Q. Didn't Mr. Bromell ever ask you to reduce the bills?  A. No sir.  I think I stated that the only conversation regarding our bills was the ten per cent, eventually reduced to five per cent.  When I refused the ten per cent, he wanted five per cent.  That is the only discussion we had relative to the bills, that is, to the amounts.

Q. Mr. Bromell never said to you those bills were too high?  A. No sir."

The testimony indicates the facts to be that the respondent made a contract with the Government for the chartering of certain steamers, which required some repairs and alterations, and the libellant was employed by the respondent to make them within a limited time allowed by the Government.  The repairs were made to the satisfaction of the Government and the bills therefor rendered by the libellant to the respondent, and some changes in form made by the libellant at the request of the respondent, which adopted them as correct and presented them to the Government for payment.  Some objection was made by the Government to the charges, particularly for carpenter labor, and the respondent then suggested to the libellant the writing of an explanatory letter, which it did and it was presented to the Government officers, who had charge of the matter, with some verbal explanations.  The Government officers were eventually satisfied by an examination with the correctness of the bills and paid the respondent the full amount of the claims, after deducting a small amount, said to have been $1498.75, which they considered as being for the benefit of the charterer and not for that of the Government.  The total amount of the work done by the libellant was $75,978.40 and the respondent paid thereon about $35,000, leaving due some $40,978.40, which the

respondent was apparently willing to pay if the libellant would reduce it by ten per cent on the full claim for the respondent's benefit. It does not appear that the respondent was entitled to any reduction from the amount of the claim, which was presented by it to the Government as correct in items and amounts. There was some understanding between the respondent and the Government that the respondent should obtain its compensation for superintending the work from the amount of the bills paid by the Government but the libellant had no part in such understanding and it was not in any way bound by it.

There is no doubt in my mind that the libellant is entitled to recover from the respondent and the only remaining question in the case is, whether the form of action of an account stated, puts the matter in such shape as to enable the court to allow a decree.

It has been said by Mr. Justice Story in his work on Equity Jurisprudence (v. 1, p. 544) as follows:

"526. What shall constitute in the sense of a Court of Equity a stated account, is in some measure dependent upon the particular circumstances of the case. An account in writing examined and signed by the parties will be deemed a stated account, notwithstanding it contains the ordinary preliminary clause that errors are excepted. But in order to make an account a stated account, it is not necessary that it should be signed by the parties. It is sufficient if it has been examined and accepted by both parties. And this acceptance need not be express, but it may be implied from circumstances. Between merchants at home, an account which has been presented and no objection made thereto after the lapse of several posts is treated under ordinary circumstances as being by acquiescence a stated account. Between merchants in different countries, a rule founded in similar considerations prevails. If an account has been transmitted from the one to the other, and no objection is made after several opportunities of writing have occurred, it is treated as an acquiescence in the correctness of the account transmitted, and therefore it is deemed a stated account. In truth in each case the rule admits or rather requires the same general exposition. It is, that an account rendered shall be deemed an account stated from the presumed approbation or acquiescence of the parties, unless an objection is made thereto within a reasonable time. That reasonable time is to be judged of in ordinary cases by the habits of business at home and abroad; and the usual course is required to be followed, unless there are special circumstances to vary it or to excuse a departure from it."

This is no doubt a correct statement of the law and applying it to the case under consideration, I conclude that the action was properly brought in the form adopted. I see no reason to refuse a recovery here of the amount demanded. The only real controversy in the case is that relating to some deduction claimed by the respondent from the amount which it has collected. The original contract here was between the Government and the respondent for the charter of some of the latter's vessels. The libellant was called in to make some repairs but this gave the respondent no legal or equitable claim to the profit or a portion of it.

There will be a decree for the libellant for $40,978.40, with interest.